**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MARY CALDWELL,**<br>                    **Plaintiff,**<br><br>            **v.**<br><br>**CAPT. LAWRENCE NODIFF, LT.**<br>**NICHOLAS BROWN, SGT. HENRY,**<br>**TEN (10) JANE and JOHN DOES, and**<br>**CITY OF PHILADELPHIA,**<br>                    **Defendants.** | **CIVIL ACTION**<br><br><br><br>**NO. 13-162** |

**DuBOIS, J.**                                                          **February 18, 2014**

**M E M O R A N D U M**

**I.      INTRODUCTION**

        This case arises out of Mary Caldwell's allegation that she was subject to discrimination

and unconstitutional searches and seizures on the basis of her race, gender, and disability at her

job as a Philadelphia police officer.  Plaintiff asserts claims against the City of Philadelphia ("the

City"), Captain Lawrence Nodiff, Sgt. Henry, and ten John and/or Jane Does for violations of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 126 *et seq*, the Pennsylvania Human Relations

Act ("PHRA"), 43 Pa. Cons. Stat. §951 *et seq*, and 42 U.S.C. § 1983 ("Section 1983").

        Defendants have moved to dismiss[1] plaintiff's First Amended Complaint.  For the

reasons discussed below, defendants' motion is granted in part and denied in part.

---

[1] Defendants entitle their motion "Partial Motion to Dismiss," but request that the Court dismiss
the entire First Amended Complaint.  Accordingly, the Court construes defendants' motion as a
motion to dismiss the First Amended Complaint, not a partial motion to dismiss.

## II.     BACKGROUND[2]

Plaintiff is an African-American female.  1st Am. Compl. ¶ 13.  Plaintiff joined the
Philadelphia Police Department ("the Department") on June 23, 1997.  *Id.* ¶ 14.  In February
2004, plaintiff was promoted to the rank of Detective and was assigned to the "South Detective
Division." *Id.* ¶ 16.  Her supervisors at the South Detective Division were Sgt. Gwenn Barlett, a
white female, Lt. Docherty, a white male, and Capt. Joe DiLacqua, a white male.  *Id.*  Sometime
between 2006 and 2007, plaintiff was diagnosed with hypertension, causing her to suffer
dizziness, chest and muscle pain, muscle spasms, tunnel vision, and swelling.  *Id.*  DiLacqua was
aware of plaintiff's diagnosis, and made comments to her that she was using too much sick time
and that she must use unpaid personal time instead.  *Id.* ¶ 17.  In 2007, despite producing
doctors' notes, plaintiff received multiple counseling memos regarding her absences, and
DiLacqua placed plaintiff on the Sick Abuse list.  *Id.* ¶ 18.

In 2007, plaintiff was transferred to "gun permits," where her supervisors were Sgt. John
Sharkey, Lt. Lisa King, and Capt. Sonya Velazquez. *Id.* ¶ 19.  By 2009, plaintiff's condition had
worsened, and she was diagnosed with severe hypertension, causing her to use more sick time.
*Id.* ¶¶ 21-22.  King began "harassing" plaintiff about her use of sick days and repeatedly asked
plaintiff if she was being domestically abused, if she was on drugs, and if she had a drinking
problem.  *Id.* ¶ 21.  Plaintiff was sick checked at her home multiple times, unlike other officers
with similar numbers of hours worked.  *Id.* ¶ 21.  When plaintiff left her shift early for a doctor's
appointment, she lost vacation/sick time, whereas other officers did not lose such time.  *Id.* ¶ 22.
In November 2010, plaintiff complained about her treatment, after which King called a meeting
with plaintiff and told her that she was emotionally distressed.  *Id.* ¶ 25.  King then took

---

[2] The factual background is taken from plaintiff's First Amended Complaint and is set forth only
to the extent necessary to address the questions before the Court.

plaintiff, involuntarily, to a mental-health facility, where she was released within ten minutes. *Id.* A few days later, King met with plaintiff at her house and took her gun, telling her that she was mentally unable to carry a weapon. *Id.* ¶ 26. The next day, plaintiff arrived at work but was sent home because she had been deemed a "mentally unstable person." *Id.* Due to her designation as a "mentally unstable person," plaintiff was unable to return to work and was forced to use personal time until she reported to an employee medical health facility. *Id.* The City scheduled her appointment with a psychiatrist almost eight weeks later, after which she was immediately cleared to return to work. *Id.* ¶ 28. In all, plaintiff remained on no-duty status for eight to ten weeks. *Id.* Furthermore, in 2009 and 2010, plaintiff was given negative performance evaluations due to her use of sick time. *Id.* ¶ 27. Plaintiff had never received a negative evaluation before her diagnosis of hypertension. *Id.*

In December 2010, plaintiff was transferred back to South Detective Division, where she was assigned to the latest shift. *Id.* ¶ 29. Her supervisors were Sgt. Earnest Ransom, a black male, Lt. Nicholas Brown, a black male, and Capt. Nodiff, a white male. *Id.* On her first day, she was called into a meeting in which Nodiff told plaintiff that she "cannot call out sick anymore." *Id.* ¶ 30. When plaintiff explained her hypertension and symptoms, Nodiff told plaintiff he "didn't care." *Id.*

During 2010 and 2011, Nodiff and Brown harassed plaintiff regarding her disability by constantly asking her why she was calling out sick, in response to which plaintiff informed them about her condition and provided doctor's notes. *Id.* ¶ 32. Furthermore, when plaintiff was absent, she was sick checked up to three times per day. *Id.* ¶ 33. By checking the "Sending/Receiving sheet" for her squad, she learned that other male officers who had no disabilities were not being sick checked when they called out sick. *Id.* Furthermore, between

January 2011 and April  2012, the Department subjected plaintiff to drug tests at least four times in addition to the drug tests plaintiff received as a result of her hospitalization.  *Id.* ¶ 38.  Other officers who were out sick, but did not have disabilities, or who were not black or female, did not get drug tested so frequently.  *Id.*  Specifically, one white male officer, who is not disabled, was out sick and hospitalized but was not drug tested.  *Id.*

Throughout 2011, Brown told plaintiff that Nodiff was "out to get her," and wanted her medically evaluated because he did not believe she was disabled with hypertension.  *Id.* ¶ 36.  At Nodiff's request, Brown wrote negative comments about plaintiff's sick-time usage in her bi-annual performance evaluations.  *Id.* ¶ 32.  Sometime between January and July 2011, Nodiff denied plaintiff the use of five days of vacation time, unlike another officer who was approved to use six weeks of vacation time.  *Id.* ¶ 34.  In November 2011, Brown told plaintiff that Nodiff intended to reassign her to a day shift.  *Id.* ¶ 35.  Plaintiff submitted a memo to Nodiff telling him that she opposed the shift change because she would be unable to attend doctors' appointments or get sufficient sleep.  *Id*.  On March 1, 2012, plaintiff submitted a second such memo.  *Id.* ¶ 40. In April 2012, plaintiff became sick and, while in the hospital, was informed by Sgt. Hampton that Nodiff had reassigned her to a day shift.  *Id.* ¶ 41.  Plaintiff was unable to return to work due to her high blood pressure and hypertension.  *Id.*  She was then placed on leave for one year pursuant to the Family Medical Leave Act.  *Id.*

In February 2012, plaintiff filed a complaint with Fraternal Order of Police ("FOP"), alleging that Nodiff and Brown discriminated against her and created a hostile work environment.  *Id.* ¶ 37.  Sometime in April 2012, plaintiff filed a complaint with the EEOC, alleging violations of Title VII and the ADA.  Plaintiff received a Right-to-Sue letter from the EEOC in December 2012.  *Id.*

4

On January 11, 2013, plaintiff filed the instant suit. Her First Amended Complaint contains three counts. In Count One, plaintiff alleges that the City violated Title VII and the ADA by: (1) discriminating against her on the basis of her race, gender, and disability; (2) denying her a reasonable accommodation by assigning her to a day shift; (3) retaliating against her when she complained about the discrimination; (4) subjecting her to a hostile work environment. In Count Two, plaintiff alleges that the City, Capt. Nodiff, and Lt. Brown violated the PHRA for the same conduct as is set forth in Count One. In Count Three, she alleges that the City, Sgt. Henry, and Jane and/or John Does violated Section 1983 in the administration of unreasonable searches and seizures of her body, hair, and urine.

## III.     LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides that, in response to a complaint, a defense of "failure to state a claim upon which relief can be granted" may be raised by motion to dismiss. To survive a motion to dismiss, a civil plaintiff must allege facts that "raise a right to relief above the speculative level." *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). To satisfy the plausibility standard, a plaintiff's allegations must show that defendant's liability is more than "a sheer possibility." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

In *Twombly*, the Supreme Court used a "two-pronged approach," later formalized in

*Iqbal*. *Iqbal*, 556 U.S. at 679; *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009). Under this approach, a district court identifies those factual allegations that constitute nothing more than "legal conclusions" or "naked assertions."  *Twombly*, 550 U.S. at 555, 557.  Such allegations are "not entitled to the assumption of truth" and must be disregarded.  *Iqbal*, 556 U.S. at 679.  The court then assesses "the 'nub' of the plaintiff['s] complaint—the well-pleaded, nonconclusory factual allegation[s]"—to determine whether it states a plausible claim for relief. *Id.*

## IV.    ANALYSIS

Defendants' Motion to Dismiss presents three arguments.  First, defendants argue that many of plaintiff's allegations cannot be considered in support of her Title VII, ADA, and PHRA claims because they fall outside of the applicable 300-day limitations period.  Second, defendants argue that plaintiff failed to exhaust her administrative remedies for several of her claims.  Last, defendants argue that plaintiff's remaining claims in her First Amended Complaint fail to state a claim upon which relief can be granted and must be dismissed.  The Court addresses these arguments in turn.

### A.  300-Day Limitations Period

Defendants argue that those actions which plaintiff alleges occurred more than 300 days prior to her filing her EEOC complaint cannot be considered in support of her Title VII, ADA, or PHRA claims.  Defs.' Mem. 8 (Doc. No. 9).  Plaintiff responds by arguing that she "provides as evidence of her charges under Title VII, the PHRC [sic], and the ADA, only those actions which are or believed to be within the prescribed 300 day limitations period."  Pl.'s Resp. 7 (Doc. No. 11).

Under the ADA and Title VII, a plaintiff has 300 days from the alleged unlawful

6

employment actions to file a charge of employment discrimination with the EEOC. *Patterson v. AFSCME # 2456*, 320 F. App'x 143, 145 (3d Cir. 2009). Discrete discriminatory actions occurring outside the 300-day limitations period are not actionable, but may still be cited as background in support of a timely claim. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

In this case, plaintiff filed her EEOC complaint in April 2012.[3] Accordingly, the Court considers allegations of acts occurring before June 2011 — 300 days prior to April 2012 — only as background in support of plaintiff's timely claims. *Morgan*, 536 U.S. at 113.

### B. Exhaustion of Administrative Remedies

Next, defendants argue that plaintiff failed to exhaust her administrative remedies for several of her claims because the allegations in those claims are outside the scope of her EEOC complaint. Before filing a judicial complaint, a plaintiff alleging discrimination under Title VII or the ADA must exhaust her administrative remedies by filing a complaint with the EEOC. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 163 (3d Cir. 2013); *Williams v. E. Orange Cmty. Charter Sch.*, 396 F. App'x 895, 897 (3d Cir. 2010) (noting that exhaustion requirement applies to ADA claims).[4] The resulting suit is limited to those allegations that are "within the scope of the prior EEOC complaint, or a reasonable investigation arising therefrom." *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir.1996). "The legal analysis for whether a judicial complaint is within the scope of an earlier administrative charge or a reasonable investigation therefrom turns

---

[3] The precise date in April that plaintiff filed her EEOC complaint is not clear. Plaintiff signed and dated the EEOC complaint on April 13, 2012, but the complaint is time stamped as "received" by the EEOC on April 17, 2012. Defs.' Rep. Br. Ex. 1. The precise date is of no consequence at this stage of the litigation because plaintiff does not allege that any acts occurred in June 2011 — 300 days prior to April 2012.

[4] To file suit under the PHRA, a plaintiff must file suit with the Pennsylvania Human Relations Commission ("PHRC"). *Mandel*, 706 F.3d at 163. In this case, plaintiff dual-filed with the EEOC and the PHRC.

on whether 'there is a close nexus between the facts supporting each claim or whether additional charges made in the judicial complaint may fairly be considered explanations of the original charge or growing out of it.'" *Ivory v. Radio One, Inc.*, No. 01-5708, 2002 WL 501489 (E.D. Pa. Apr. 3, 2002) (citing *Fakete v. Aetna Incorp.*, 162 F. Supp. 2d 722, 732 (E.D. Pa. 2001)).

### 1. *Reasonable-Accommodation Claim — Counts I and II*

Plaintiff's reasonable-accommodation claim under the ADA is premised exclusively on Nodiff's action in reassigning her to a day shift. Defendants argue that because plaintiff's EEOC complaint does not mention her reassignment to a day shift, that allegation is outside the scope of her EEOC complaint or a reasonable investigation arising therefrom. The Court agrees. Plaintiff's EEOC complaint makes no mention of a shift change, even though plaintiff was told about Nodiff's intent to reassign her in November 2011 — some five months prior to her filing of the EEOC complaint. 1st Am. Compl. ¶ 35. Plaintiff argues that her statement in the EEOC complaint that "Nodiff does not like me and wants me out" brings her reassignment within the scope of the EEOC complaint. Pl.'s Resp. 11. The Court rejects this argument. The statement "Nodiff does not like me and wants me out," does not share "a close nexus" of underlying facts with plaintiff's shift change. Accordingly, the Court concludes plaintiff did not exhaust her administrative remedies with respect to her reasonable-accommodation claim.[5] Defendants' motion to dismiss is granted as to this claim and plaintiff's reasonable-accommodation claim is dismissed. This dismissal is without prejudice to plaintiff's right to amend her First Amended Complaint if she is able to exhaust her administrative remedies as to this claim.

---

[5] Plaintiff also cites the shift change as evidence of her discrimination, hostile work environment, and retaliation claims. The Court finds that plaintiff's shift change is outside of the scope of her EEOC complaint for her other claims as well.

8

2. *Retaliation Claim — Counts I and II*

Plaintiff's retaliation claim is premised on her allegation that she was subjected to at least four unwarranted drug tests because of her filing of complaints with the FOP and EEOC. Defendants argue that plaintiff's allegation of drug tests is unexhausted because she does not mention the drug tests in her EEOC complaint. The Court rejects this argument. Plaintiff states in her EEOC complaint that she was discriminated against when Nodiff directed that she be "questioned about possible mental illness, *drug and/or alcohol addiction*, and domestic abuse." Defs.' Rep. Br. Ex. 1 (emphasis added). The Court concludes that a reasonable investigation of this complaint would have revealed the alleged drug tests. Thus, the drug tests — whether they are offered in support of plaintiff's retaliation, discrimination, or hostile work environment claims — are within the scope of plaintiff's EEOC complaint.

3. *Hostile-Work-Environment Claim — Counts I and II*

Defendants next argue that plaintiff did not exhaust her Title VII hostile-work-environment claim because her EEOC complaint only alleges harassment on the basis of her disability, not on the basis of any Title VII protected characteristic. The Court rejects this argument and concludes that plaintiff's hostile-work-environment claim has been exhausted.

"[T]he individuals who draft charges are often 'not well [versed] in the art of legal description' and as a result, 'the scope of the original charge should be liberally construed.'" *E.E.O.C. v. UPMC*, 471 F. App'x 96, 100 (3d Cir. 2012) (alterations in original) (quoting *E.E.O.C. v. Kronos Inc.*, 620 F.3d 287 (3d Cir. 2010)). Plaintiff's EEOC complaint states that she was "subjected to harassment based on [her] disability" when she was repeatedly told that she used too much sick time. Defs.' Rep. Br. Ex. 1. Within that same paragraph, she states that she believes she was discriminated against "based on race and sex" when she was "questioned

9

about possible mental illness, drug and/or alcohol addiction, and domestic abuse." *Id.* Construing plaintiff's EEOC complaint liberally, the Court concludes that plaintiff's hostile-work-environment claim is within the scope of her EEOC complaint.

### C.  Failure to State a Claim

#### 1.  *Discrimination Claims*[6] — *Counts I and II*

Defendants argue that plaintiff fails to state a claim of disparate treatment under Title VII and the ADA.  Defendants' first argument is that plaintiff fails to allege an adverse employment action, as is required for both her Title VII and ADA claims.  *See Lewis v. Bell Atl./Verizon*, 321 F. App'x 217, 220 (3d Cir. 2009) (Title VII); *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (ADA).  An adverse employment action is an "action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment."  *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004).  Unlike Section 1983, Title VII permits plaintiff to use the doctrine of respondeat superior to hold a municipal agency vicariously liable for the actions of its employees.  *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 630 (7th Cir. 2009).

Defendants dispute that "verbally counsel[ing] [plaintiff] on multiple occasions and wr[iting] negative comments regarding her sick-time usage in her performance evaluations" amounts to an adverse employment action.  1st Am. Compl. ¶ 46(a).  Negative performance evaluations are not adverse employment actions unless the negative performance evaluation has some "tangible effect upon the recipient's employment."  *Kosakoski v. PNC Fin. Servs. Grp., Inc.*, 12-cv-00038, 2013 WL 5377863 (E.D. Pa. Sept. 26, 2013).  In this case, plaintiff does not

---

[6] Plaintiff asserts discrimination claims under the ADA, Title VII, and the PHRA.  Because the legal standard for claims under the PHRA is the same as those brought under Title VII, the Court will not separately address plaintiff's PHRA claims.  *See Weston v. Pennsylvania*, 251 F.3d 420, 426 n.3 (3d Cir. 2001).

allege any "tangible effect" on her employment as a consequence of the negative performance evaluations, and thus the Court concludes that plaintiff's negative evaluations do not constitute adverse employment actions.

Defendants also argue that plaintiff's allegation that she was sick checked three times per day does not amount to an adverse employment action.  The Court rejects this argument. Plaintiff alleges that when she called out sick from work she was sick checked up to three times per day.  1st Am. Compl. ¶¶ 33.  Plaintiff further alleges she was harassed about her use of sick time and that other male officers who had no disabilities were not sick checked as often.  1st Am. Compl. ¶¶ 32-33.  Read in a light most favorable to plaintiff, plaintiff alleges that such stringent enforcement of the sick-checking policy altered the "terms, conditions, or privileges" of plaintiff's employment.  *Storey*, 390 F.3d at 764 (3d Cir. 2004); *Cf. Moore v. City of Philadelphia*, 461 F.3d 331, 352 (3d Cir. 2006) ("[E]nforcing the sick check policy so vigorously would allow a jury to conclude that the disparate application of this policy well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  (internal quotation marks omitted)).  Accordingly, the Court concludes that plaintiff has alleged an adverse employment action based on the way in which the sick-check policy was enforced.

Defendants also argue that even if these acts are adverse, plaintiff has not shown that they occurred under circumstances that could give rise to an inference of intentional discrimination, as is required for her Title VII and ADA claims.  *See Lewis*, 321 F. App'x at 220; *Gaul*, 134 F.3d at 580.  Specifically, defendants argue that plaintiff fails to state a claim because she "does not allege that other white, male, non-disabled employees were treated differently."  Defs.' Mem. 17-18.

The Court rejects this argument.  Defendants incorrectly state the law.  A plaintiff is not

11

required to show someone outside her protected group was treated dissimilarly. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 357 (3d Cir. 1999) ("[A] plaintiff c[an] make out a prima facie case even without demonstrating that employees outside of the relevant class were treated more favorably.")  Plaintiff need show only "some causal nexus between h[er] membership in a protected class" and the employer's adverse action.  *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003).  In this case, plaintiff alleges that other officers who were out sick "but did not have a disability, or who were not black or female" did not get drug tested as often as plaintiff.  *See, e.g.*, 1st Am. Compl. ¶ 46.  Plaintiff also alleges that she was sick checked more frequently than male officers who had no disabilities.  *Id.*  Finally, plaintiff alleges that the drug tests and sick checks she was subjected to were in violation of the Department's Directives[7] governing sick leave and drug testing.  *Id.*  Reading the First Amended Complaint in the light most favorable to plaintiff, the Court concludes that plaintiff's allegations of disparate treatment and the Department's failure to follow the Directives state a plausible claim under Title VII and the ADA.

### 2.  *Hostile-Work-Environment Claims — Counts I and II*

Defendants argue plaintiff has not alleged sufficiently "severe or pervasive" conduct to support a claim for hostile work environment.  Defs.' Mem. 19; *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (noting that plaintiff must show "severe or pervasive" discrimination as one element of hostile-work-environment claim).  What constitutes "severe or pervasive" discrimination is not a "mathematically precise test." *Harris*, 510 U.S. at 23–24.  Rather, the

---

[7] Plaintiff argues that defendants attached documents outside the pleadings when they attached Philadelphia Police Department Directives #66 (policy governing sick leave) and #55 (policy governing drug testing) to their Motion to Dismiss.  Plaintiff is incorrect.  Courts may consider undisputedly authentic documents upon which a plaintiff's complaint is based.  *See Pension Ben. Guar. Corp.*, 998 F.2d at 1196.  In this case, plaintiff refers to the Directives in paragraphs 18, 46, and 70 of her First Amended Complaint.  Accordingly, the Court considers these documents.

Court must look to the totality of the circumstances, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23.

The Court will not dismiss plaintiff's hostile-work-environment claim at this stage of the proceedings.[8] Plaintiff alleges the following actions in support of that claim: (1) During 2010–2011, Capt. Nodiff and Lt. Brown would continually harass Plaintiff regarding her disability and absences from work; (2) Lt. Brown, at Capt. Nodiff's request, verbally counseled plaintiff about her sick-time usage on multiple occasions and wrote negative comments regarding her sick-time usage in performance evaluations; (3) when she was out sick, she was sick-checked up to three times per day, unlike other male non-disabled officers; (4) in January 2011, plaintiff submitted a memo requesting five days of vacation for July 2011 but her request was denied by Nodiff; (5) from January 2011 through April 2012, plaintiff was drug tested at least four times, unlike other white, male officers who had no disabilities.  Moreover, plaintiff alleges similar actions outside of the 300-day limitations period as far back as 2007, which the Court considers as background in support of her timely claims.  *Morgan*, 536 U.S. at 113.  Reading the First Amended Complaint in the light most favorable to plaintiff, the Court concludes that plaintiff states a plausible hostile-work-environment claim under Title VII.

### 3. *Retaliation Claims — Counts I and II*

Plaintiff's retaliation claim is premised on her allegation that she was subjected to at least

---

[8] Courts in this Circuit have "shown a reluctance to dismiss a complaint at the 12(b)(6) stage when the primary challenge to the hostile work environment claim is whether or not the conduct in question is severe and/or pervasive." *Booker v. Nat'l R.R. Passenger Corp.*, 880 F. Supp. 2d 575, 582 (E.D. Pa. 2012) (DuBois, J.) (citing *Grasty v. World Flavors, Inc.*, No. 11-cv-1778, 2011 WL 3515864, at *9 n. 2 (E.D. Pa. Aug 11, 2011)).

four unwarranted drug tests because of her filing of complaints with the FOP and EEOC. Defendants argue that because plaintiff does not allege the specific dates on which she was drug tested, she has failed to show that "a causal connection existed between the protected activity and the adverse employment action," as is required to state a claim for retaliation. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).[9]  The Court rejects defendants' argument.

To establish a causal connection, a plaintiff must either show that the protected activity and the adverse action were so close in time such that the timing is "unduly suggestive" of causation or that "timing plus other evidence" establishes causation. *Moore v. Shinseki*, 487 F. App'x 697, 698 (3d Cir. 2012).  The Court concludes that plaintiff has plausibly alleged a causal connection between her complaint to the FOP and EEOC and her being subjected to excessive drug tests.  Plaintiff states that she engaged in two protected activities: (1) filing a complaint with the FOP in February 2012 and (2) filing an EEOC complaint in April 2012.  Am. Compl. ¶ 49; Defs.' Rep. Br. Ex. 1.  As a result of those protected acts, plaintiff claims she was retaliated against when she was given approximately four drug tests "from January 2011 through April 2012."  1st Am. Compl. ¶ 46.  Read in a light most favorable to plaintiff, one or more of those alleged drug tests occurred after plaintiff filed complaints with the FOP or EEOC — sometime between February and April 2012.  Thus, the Court concludes that plaintiff has alleged facts which plausibly state a claim for relief for retaliation.  *Moore*, 487 F. App'x at 698.

### 4. *Section 1983 Claims for Unreasonable Search and Seizure Against the City, Sgt. Henry, and Jane and/or John Does — Count III*

In Count Three of her First Amended Complaint, plaintiff alleges she was subjected to four or more unwarranted drug tests in violation of her Fourth Amendment right against

---

[9] The elements of a prima facie retaliation claim under the ADA, PHRA, and Title VII are the same.  *See  Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997).

unreasonable search and seizure.  Defendants argue that plaintiff has failed to state a Section 1983 claim against the City under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) and against Sgt. Henry and Jane and/or John Does personally.

i.    Claims against the City

Municipal liability under Section 1983 is limited to those circumstances in which the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  *Monell*, 436 U.S. at 694.  The United States Court of Appeals for the Third Circuit has outlined three circumstances in which municipal liability will attach under Section 1983:

> First, the municipality will be liable if its employee acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity; second, liability will attach when the individual has policy making authority rendering his or her behavior an act of official government policy; third, the municipality will be liable if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes.

*McGreevy v. Stroup*, 413 F.3d 359, 367 (3d Cir. 2005) (internal citations omitted).

In this case, plaintiff alleges that the drug tests "were directed to be done by the actions and orders of other Does, which may include Capt. Nodiff," 1st Am. Compl. ¶ 70, and were done "without a warrant, reasonable suspicion of drug use, or voluntary consent."  *Id.* ¶ 67.  Plaintiff further states that the drug tests were "administered using the City's policy for drug testing (PPD Directive)," 1st Am. Compl. ¶ 70, but were "not done in accordance with the Directives," *id.* ¶ 46.  The Directive in question is Police Directive #55, which permits drug testing in four situations: (1) when reasonable suspicion of drug use exists; (2) as part of a routine physical examination; (3) pursuant to random selection; or (4) for police recruits.

The Court concludes that plaintiff has not stated a claim under Section 1983 against the

City.  Because plaintiff alleges that the drug tests were "not done in accordance with the

Directives," *id.,* plaintiff must show that the claimed violation of Police Directive #55 was "a

standard operating procedure long accepted within the government entity."[10]  *McGreevy*, 413 at

367.  Plaintiff does not meet this standard because she does not allege a pattern of violations of

Directive #55 by the City.  Indeed, she alleges just four instances of unwarranted drug tests, all

of them on her.  Thus, the Court grants defendants' motion to dismiss as to plaintiff's Section

1983 claim against the City.  Such dismissal is without prejudice to plaintiff's right to amend the

First Amended Complaint if warranted by the facts and applicable law.

ii.    <u>Claims Against Sgt. Henry and Jane and/or John Does</u>

Plaintiff also sues Sgt. Henry and Jane and/or John Does in their personal capacity,

alleging liability against both: (1) officers who administered the drug tests and (2) officers that

"failed to intervene" to stop the drug tests.  Defendants dispute the liability of only the latter

officers, but the Court will address both in turn.

Plaintiff does not state what kind of drug testing she was subjected to, but she does allege

that both her hair and urine were seized.  1st Am. Compl. ¶ 67.  The taking of urine to conduct a

government-imposed urinalysis is a search within the meaning of the Fourth Amendment and

must therefore be "reasonable."[11]  *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665

(1989).  "Where, as here, only specific police officers are targeted, the search must be supported

---

[10] To the extent plaintiff is alleging that a policymaker violated her rights or ratified the
unconstitutional actions of a subordinate, plaintiff's complaint does not state a claim because she
names no individual with policy-making authority.  *See* 53 Pa. Stat. Ann. § 66902 (vesting
authority over the "organization and supervision" of township police officers with the township
board of supervisors).

[11] The taking of hair above the hair root does not constitute a search.  *See In re Grand Jury
Proceedings (Mills)*, 686 F.2d 135 (3d Cir. 1982); *Coddington v. Evanko*, 112 F. App'x 835, 838
(3d Cir. 2004) ("*Mills* was clear in holding that there is a difference between the hair root and the
exposed portion of hair.")

by 'reasonable suspicion.'" *Kramer v. City of Jersey City*, 455 F. App'x 204, 207 (3d Cir. 2011) (citing *Copeland v. Phila. Police Dep't*, 840 F.2d 1139, 1143 (3d Cir.1988)).  In this case, plaintiff alleges that she was tested without reasonable suspicion of drug use.  1st Am. Compl. ¶ 67.  That is sufficient to state a claim under the circumstances of this case.  Accordingly, the Court will not dismiss plaintiff's claims against the officers who administered the drug tests.

With regard to plaintiff's assertion of liability against officers who "failed to intervene," however, the Court concludes that those officers are entitled to qualified immunity.  The doctrine of qualified immunity provides that government officials are immune from suits for civil damages under Section 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Reedy v. Evanson,* 615 F.3d 197, 224 (3d Cir. 2010) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "This inquiry turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." *Pearson*, 555 U.S. at 244 (internal quotation marks omitted).

The Court concludes that an officer's failure to intervene to stop what plaintiff avers are unreasonable drug tests does not violate a clearly established statutory or constitutional right of which a reasonable officer would have known.  The failure-to-intervene doctrine has primarily been applied in the context of excessive-force claims under the Eighth or Fourth Amendment. *See, e.g.*, *Knox v. Doe*, 487 F. App'x 725, 727 (3d Cir. 2012) ("[A] corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do

so.").  In such cases, the Third Circuit has referred to the duty to intervene broadly at times, stating, "If a police officer, whether supervisory or not, fails or refuses to intervene when *a constitutional violation such as an unprovoked beating* takes place in his presence, the officer is directly liable under Section 1983."  *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (emphasis added) (internal quotation marks omitted).

Notwithstanding the sometimes broad statements about the scope of the failure-to-intervene doctrine, however, the Court has not found a case applying the failure-to-intervene doctrine to a case analogous to this one where the alleged constitutional violation is an unreasonable search and seizure of a person's bodily fluids for the purposes of testing for substance abuse.  Under these circumstances, the Court concludes that it would not be clear to a reasonable officer that his failure to intervene in what plaintiff avers was an unreasonable drug test was unlawful.  *Walker v. Jackson*, No. 12-cv-10267, 2013 WL 3379685, at *5 (D. Mass. July 8, 2013) ("The court has not found any support for the proposition that allowing a fellow officer to enter a residence and participating in the subsequent search constitutes a claim for failure to intervene.").  Thus, the Court concludes that Sgt. Henry and Jane and/or John Does are entitled to qualified immunity with respect to plaintiff's Section 1983 claim insofar as it asserts liability against officers who failed to intervene with respect to the four drug tests.  The Court dismisses plaintiff's Section 1983 claim in Count Three with prejudice to the extent it seeks to hold Sgt. Henry and Jane and/or John Doe officers liable for failing to intervene to stop the drug testing of plaintiff.

## V.    CONCLUSION

For the foregoing reasons, the Court grants defendants' Motion to Dismiss plaintiff's claims relating to plaintiff's reassignment to a day shift and dismisses plaintiff's reasonable

accommodation claims based on that reassignment in Counts One and Two.  This dismissal is without prejudice to plaintiff's right to file a second amended complaint if she is able to exhaust her administrative remedies with respect to these claims.  The Court also grants defendants' Motion to Dismiss plaintiff's Section 1983 claim against the City in Count Three of plaintiff's First Amended Complaint.  Such dismissal is without prejudice to plaintiff's right to file a second amended complaint within twenty (20) days if warranted by the facts and applicable law. Finally, the Court grants defendants' Motion to Dismiss plaintiff's Section 1983 claim in Count Three insofar as it seeks to hold officers liable under a failure-to-intervene theory with respect to drug testing of plaintiff and dismisses that claim with prejudice.

The Court denies defendants' Motion to Dismiss in all other respects.  The claims remaining in the case are (1) discrimination claims in Counts I and II, (2) retaliation claims in Counts I and II, (3) hostile work environment claims in Counts I and II, and (3) Section 1983 claim in Count III against officers who administered the drug tests.  An appropriate order follows.